

# In the
# Missouri Court of Appeals
# Western District

DAVID PILOSKI,                          )
                                        )
                Appellant,       )  WD79597
                                        )
v.                                      )  OPINION FILED:  October 25, 2016
                                        )
DIVISION OF EMPLOYMENT                  )
SECURITY,                               )
                                        )
                Respondent.      )

### Appeal from the Labor and Industrial Relations Commission

Before Division One:  Thomas H. Newton, Presiding Judge, Cynthia L. Martin, Judge
and Edward R. Ardini, Jr., Judge

David Piloski ("Piloski") appeals the decision of the Labor and Industrial Relations Commission ("Commission") denying him unemployment benefits following his resignation from FTL Nimbus, LLC, d/b/a Automation Service ("Employer").  Piloski argues that the Commission erred in concluding that he voluntarily left work without good cause attributable to Employer.  We affirm the Commission's decision.

## Factual and Procedural Background[1]

Piloski was hired by Employer's predecessor in October 2007, after Piloski responded to an advertisement for a welder position that indicated "Will work in clean, A/C environment." After he was hired, Piloski and one other welder welded flow control systems, work that had to be done in a temperature controlled "clean room." Two other welders worked outside the clean room welding valve bodies and valve balls that did not have to be welded in a clean room. Piloski was occasionally required to weld outside the clean room to fill in for a welder working in that area. This occurred on average once or twice a month, and usually for thirty to sixty minutes at a time.

Employer acquired the business that had hired Piloski in August 2013. After Employer acquired the business, Piloski was again periodically asked to perform welding work outside the clean room. Piloski refused, telling Employer he had not been hired to work outside the clean room. Piloski's supervisors consulted with the human resources department, and were told that Piloski needed to work where ordered to work. Nonetheless, for some period of time, Piloski's supervisors appear to have acquiesced in Piloski's objection to working outside of the clean room.

Eventually, however, in early August 2015, Employer told Piloski and the other clean room welder that they would each be required to work outside the clean room for two hours per day. The valve bodies and valve balls welded outside the clean room could

---

[1]"[I]n unemployment benefit cases, we do not view the facts in the light most favorable to the Commission's decision; instead, we view the evidence objectively. However, on matters of witness credibility, we will defer to the Commission's determinations." *Lucido v. Div. of Emp't Sec.*, 441 S.W.3d 172, 174 (Mo. App. W.D. 2014) (citation omitted).

contain chemical residue which, when heated, could give off fumes. Employer provided a fume extractor to catch any chemical residue fumes. When Piloski was required to work outside the clean room, he was the only welder doing so, and had exclusive access to the fume extractor.

On approximately August 15, 2015, Piloski was told by Employer that he and the other clean room welder would be required to work alternating weeks outside the clean room because a welder in that area had quit. Piloski believed Employer was moving to having him work outside the clean room more regularly on a permanent basis.

On August 17, 2015, Piloski told Employer that he experienced chemical residue fumes working outside the clean room and got a headache. Piloski told Employer he would not work outside the clean room anymore.

On August 18, 2015, Employer met with Piloski. Piloski told Employer he had been hired to be a welder in the clean room. Employer told Piloski he had been hired to be a welder. Piloski raised concerns about chemical fumes that could result from welding outside the clean room. Employer told Piloski that whenever he was assigned to work outside the clean room, he would be the only welder in the area, and would have exclusive use of the fume extractor.

During this meeting, Employer told Piloski that if he refused to weld outside the clean room, he would be terminated for insubordination. Piloski asked if he could resign. Employer told Piloski that was his prerogative.

The next day, Piloski reported for work as directed outside the clean room. However, he submitted a resignation notice on Employer's form indicating his resignation

3

effective September 11, 2015. Although the form provided space for Piloski to explain why he was resigning, Piloski's offered no written explanation. From August 19, 2015, until September 11, 2015, Piloski worked as a welder where instructed, including outside the clean room.

After the effective date of his resignation, Piloski applied for unemployment benefits. A deputy of the Division of Employment Security ("Deputy") concluded that Piloski was disqualified from receiving benefits because he voluntarily quit work without showing good cause attributable to Employer. The Deputy concluded that Piloski did not take reasonable steps to maintain his employment.

Piloski appealed the Deputy's decision to the Appeals Tribunal ("Tribunal"). The Tribunal heard testimony from Piloski and two Employer representatives. The Tribunal concluded that requiring Piloski to work outside the clean room constituted a substantial change in the terms and conditions of Piloski's employment that would compel a reasonable employee to cease working. The Tribunal reversed the Deputy's determination that Piloski was disqualified from receiving unemployment benefits.

Employer appealed to the Commission. The Commission adopted the Tribunal's factual findings, and made some additional factual findings. The Commission concluded that Piloski did not sustain his burden to establish that he had good cause for voluntarily quitting his employment. The Commission concluded that Piloski's decision to quit was not compelled by a medical need, and that Piloski quit in response to a change in his work conditions that he found unacceptable. The Commission concluded that the change in Piloski's work conditions was not substantial, and that Piloski did not act as a reasonable

4

employee would act in electing to voluntarily quit. The Commission also concluded that Employer's response to mitigate Piloski's expressed concern about chemical fumes was reasonable. The Commission reversed the Tribunal's decision, and denied Piloski unemployment benefits.

Piloski filed this timely appeal.

## Standard of Review

Article V, section 18 of the Missouri Constitution provides for judicial review of an administrative decision affecting private rights to determine if it is authorized by law and "supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, sec. 18. Section 288.210[2] governs appellate review of the Commission's decision in an unemployment compensation case. *Stephenson v. Div. of Emp't Sec.*, 411 S.W.3d 835, 838 (Mo. App. W.D. 2013). Relevant to this case, we may modify, reverse, remand, or set aside a decision of the Commission where "the facts found by the commission do not support the award; or . . . there was no sufficient competent evidence in the record to warrant the making [or denial] of the award." Section 288.210(3)-(4).

Our review "must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Sheridan v. Div. of Emp't Sec.*, 425 S.W.3d 193, 198 (Mo. App. W.D. 2014) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222-23 (Mo. banc 2003)). We do not review the decision of the Tribunal, except to

---

[2]All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

the extent factual findings of the tribunal are adopted by the Commission. *Sanders v. Div. of Emp't Sec.*, 417 S.W.3d 895, 897 (Mo. App. W.D. 2014). While we give deference to the Commission's findings of fact, we are "not bound by the Commission's conclusions of law or the Commission's application of law to the facts." *Timberson v. Div. of Emp't Sec.*, 333 S.W.3d 30, 32 (Mo. App. W.D. 2010).

**Analysis**

Piloski raises a single point on appeal. Piloski argues that the Commission erroneously applied the law to the facts to conclude that he did not have good cause to voluntarily quit his employment because: (i) a reasonable employee would quit if he knew work conditions were causing adverse health effects; (ii) Employer acquiesced for 8 years about where his work would be performed; (iii) there was a substantial change in his work conditions; and (iv) the fume extractor was not a solution because Employer knew the work load would require two welders to be working outside the clean room at the same time.

Unemployment benefits are reserved "for the benefit of persons unemployed through no fault of their own," and Missouri employment security laws must be "liberally construed to accomplish [this] purpose." Section 288.020. Section 288.050 disqualifies a claimant from receiving unemployment compensation if "the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer." Section 288.050.1(1). The requirement of showing good cause following voluntary resignation "bespeaks a legislative intention to create an incentive for employed persons to remain employed by withholding benefits from those who quit their jobs without good cause." *Hessler v. Labor & Indus. Relations Comm'n*, 851 S.W.2d 516, 518 (Mo. banc

6

1993).  Good cause is defined by statute as "only that cause which would compel a reasonable employee to cease working or which would require separation from work due to illness or disability."  Section 288.050.1(1).[3]  Section 288.050.1(1) should be construed "strictly and narrowly in favor of finding that an employee is entitled to compensation." *Martin v. Div. of Emp't Sec.*, 460 S.W.3d 414, 417 (Mo. App. W.D. 2015) (quoting *Baby-Tenda Corp. v. Hedrick*, 50 S.W.3d 369, 374 (Mo. App. W.D. 2001)).

It is uncontested that Piloski left work voluntarily.  The sole issue raised by Piloski on appeal is whether he voluntarily quit his employment for good cause, and thus under circumstances that would compel a reasonable employee to cease working or which would require separation from work due to illness or disability.  The determination of whether an employee had good cause to voluntarily quit his employment is a question of law we review without deference to the Commission's determination.  *Id.*  The burden to prove good cause rests on the party seeking benefits.  *Id.*

Piloski claims it was error to find that he failed to sustain his burden to establish good cause to voluntarily quit for four reasons.  First, Piloski claims that a reasonable employee would have quit knowing work conditions were causing adverse health effects. The Commission found, however, that Piloski did not establish that his decision to voluntarily quit was compelled by medical need.  In other words, Piloski did not establish that his work conditions were causing adverse health effects.  Piloski had periodically

---

[3]Section 288.050.1(1) was modified in 2014 to include a statutory definition for "good cause."  Before being afforded a statutory definition, "good cause" was construed by Missouri cases in a manner that is not materially distinguishable from the statutory definition.  *See, e.g.*, *Darr v. Roberts Mktg. Grp., LLC*, 428 S.W.3d 717, 724 (Mo. App. E.D. 2014) ("Good cause has been interpreted to mean those circumstances that would cause a reasonable person in a similar situation to leave the employment rather than continue working.").

7

worked for years outside the clean room, and never complained about health issues until he claimed a headache on August 17, 2015, two days after learning he would be required for some period of time to work outside the clean room every other day. It was not error for the Commission to conclude that this slim evidence failed to establish medical need compelling Piloski to quit. The causal connection between Piloski's headache, which he characterized as "swelling of the brain" in his brief, [Appellant's Brief, p. 11], and welding outside the clean room would not be within a layperson's common knowledge or experience. *Cf. Martin*, 460 S.W.3d at 420 (finding that the causal connection between lighting conditions and claimant's headaches and eye strain was not within common knowledge). Unless within the common knowledge or experience of a layperson, "a claimant [who] quits a job and seeks unemployment compensation benefits alleging medical reasons as good cause for quitting, . . . must adduce expert medical evidence to prove a causal connection between the employee's work and the medical reason relied on." *Id.* at 418 (quoting *Mena v. Cosentino Grp., Inc.*, 233 S.W.3d 800, 804 (Mo. App. W.D. 2007)). Piloski did not present expert medical evidence to establish a causal connection between working outside the clean room and his reported headache. Similar to *Martin*, "the record in this case merely contains [Piloski's] bare allegations that the [fumes] caused his symptoms." *Id.* at 419. Because Piloski did not establish that he had experienced adverse health effects from his employment, it is immaterial whether other employees would quit knowing work conditions are causing adverse health effects.

Second, Piloski argues that Employer acquiesced for 8 years about where his work would be performed. Piloski offers no authority for the proposition that this "fact" is of

any legal significance in assessing whether a voluntary quit is for good cause. Rather, it is settled law that a mere change in work duties is not sufficient in and of itself to support a finding of good cause. "Nothing in section 288.050 suggests a legislative intent to afford employment security in connection with an employee's right to hold a specific position." *Kimble*, 388 S.W.3d 634, 640 (Mo. App. W.D. 2013). "[M]any types of changes in working conditions and duties, even if subjectively unwelcome, would not cause an objectively reasonable person to quit and voluntarily to choose unemployment." *Darr v. Roberts Mktg. Grp., LLC*, 428 S.W.3d 717, 728 (Mo. App. E.D. 2014). It is immaterial, therefore, that Piloski had worked primarily in the clean room for 8 years.

Third, Piloski argues that the change in his work conditions was a substantial change. It is true that dissatisfaction with a change in work conditions will support a finding of good cause if "based on a ***substantial*** change in . . . working conditions from those in force at the time the claimant's employment commenced." *Reno v. Tyson Poultry, Inc.*, 204 S.W.3d 347, 351 (Mo. App. W.D. 2006) (emphasis added). Here, the Commission found that the change in Piloski's work conditions was not substantial. This was not an erroneous legal conclusion. Despite the advertisement to which Piloski responded when first hired in October 2007, Piloski had never been afforded the luxury of refusing to work outside the clean room. Until Employer acquired the business, Piloski apparently agreed to work outside the clean room on request and without complaint. The "changes" in Piloski's work conditions that occurred after Employer acquired the business were that (i) Piloski began verbalizing an objection to requests that he work outside the clean room; and (ii) Piloski was being requested to work outside the clean room more

9

frequently and for longer durations than in his first years of employment. Though Piloski was plainly dissatisfied with his working conditions, "[m]ere dissatisfaction of an employee with his working conditions does not constitute good cause." *Darr*, 428 S.W.3d at 725. To be substantial, changes in wages or working conditions from those in force when a claimant's employment commenced "must be caused by external pressures so compelling that a reasonably prudent person would be justified in terminating his employment." *Id.* (quoting *Shelby v. Hayward Baker, Inc*., 128 S.W.3d 164, 170 (Mo. App. S.D. 2004)). The Commission did not commit legal error in concluding that the changes in Piloski's work conditions were not substantial changes.

Finally, Piloski argues Employer's offer of the fume extractor was not a sufficient response to his concerns about chemical fumes. The Commission acknowledged that Piloski advised Employer he was concerned that welding outside the clean room could expose him to chemical fumes. The Commission concluded, however, that this risk did not constitute a substantial change in work conditions because Employer reasonably mitigated the risk by providing Piloski with exclusive use of a fume extractor. The Commission found that "[E]mployer's proposed solution mitigates any increased risk of exposure to fumes emitted from either [Piloski's] welding or the welding of another."

Piloski does not challenge this finding. In other words, Piloski does not argue, and offers no evidence, that the fume extractor is ineffective in mitigating the risk of chemical fumes emitted from welding outside the clean room. Instead, Piloski argues only that Employer's assurance that he would be afforded exclusive use of the fume extractor should not be believed.

10

However, Piloski offers no evidence that on those occasions when Piloski worked outside the clean room, Employer refused to honor its assurance that Piloski would have exclusive use of the fume extractor. In fact, it appears that for nearly a month after Piloski submitted his resignation, Piloski worked outside the clean room as directed every other week without incident. Piloski's suggestion on appeal that Employer would eventually stop honoring its assurance to afford him exclusive use of the fume extractor is speculative, at best. *See Martin*, 460 S.W.3d at 417 ("[C]ircumstances motivating an employee to voluntarily terminate employment must be real, not imaginary. . . .") (quoting *Hessler*, 851 S.W.2d at 518).

The Commission did not commit legal error by concluding that Piloski voluntarily quit his employment without good cause attributable to Employer.

Point denied.

### Conclusion

The Commission's decision is affirmed.


_____
Cynthia L. Martin, Judge


All concur

11